Madlyn Gleich Primoff, Esq.
madlyn.primoff@freshfields.com
Alexander Adams Rich, Esq.
alexander.rich@freshfields.com
Sarah R. Margolis, Esq.
sarah.margolis@freshfields.com
**FRESHFIELDS US LLP**
3 World Trade Center
175 Greenwich Street
New York, New York 10007
Telephone:    (212) 277-4000
Facsimile:    (212) 277-4001

*Attorneys for William E. Aziz*
*In His Capacity as Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| LI-CYCLE HOLDINGS CORP., *et al.*, | Case No. 25-XXXXX (____) |
| Debtors in Foreign Proceedings. | (Joint Administration Requested) |

**DECLARATION OF WILLIAM E. AZIZ**
**IN SUPPORT OF VERIFIED PETITION FOR**
**RECOGNITION OF FOREIGN MAIN PROCEEDINGS**
**UNDER 11 U.S.C §§ 1515 AND 1517 AND FOR RELATED**
**RELIEF PURSUANT TO 11 U.S.C. §§ 105(a), 1507(a), 1519, 1520 AND 1521**

I, William E. Aziz, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

1.    I am the Chief Restructuring Officer (the "CRO") of Li-Cycle Holdings Corp., an Ontario corporation ("Holdings"), and the duly authorized foreign representative (the "Foreign Representative") of Holdings, Li-Cycle U.S. Inc., a Delaware corporation ("North America OpCo"), Li-Cycle Inc., a Delaware corporation ("U.S. SpokeCo"), and Li-Cycle North America Hub, Inc., a Delaware corporation ("U.S. HubCo" and, together with Holdings,

North America OpCo and U.S. SpokeCo, the "Chapter 15 Debtors"). The Chapter 15 Debtors, along with certain other direct and indirect subsidiaries of Holdings[1] are subject to proceedings (the "Canadian Proceedings") under Canada's *Companies' Creditors Arrangement Act*, R.S.C. 1985 c. C-36, as amended (the "CCAA"), pending before the Ontario Superior Court of Justice (Commercial List) in Toronto (the "Canadian Court"). I submit this declaration (the "Declaration") in support of the Verified Petition for Recognition of Foreign Main Proceedings Under 11 U.S.C. §§ 1515 and 1517 and for Related Relief Pursuant to 11 U.S.C. §§ 105(a), 1507(a), 1519, 1520 and 1521 (the "Verified Petition"), filed contemporaneously herewith.

2.     Where the matters stated in this declaration are statements of fact that are within my personal knowledge, they are true. Where the matters stated in this declaration are statements of fact that are not within my personal knowledge, they are derived from documents or information supplied to me and are true to the best of my knowledge, information and belief.

3.     In preparing this declaration, I reviewed the: (i) Verified Petition; (ii) relevant provisions of the CCAA; and (iii) the documents comprising the record submitted to the Canadian Court in support of the CCAA Applicants' application for CCAA protection.[2] All facts set forth in this declaration are based on: (a) my knowledge; (b) my review of the relevant documents; or (c) my opinion based upon my experience and knowledge of the Chapter 15 Debtors' operations, industry and financial condition. If called to testify, I could and would testify competently to the facts set forth herein.

---

[1]     The Chapter 15 Debtors, together with Li-Cycle Corp., an Ontario corporation ("Global HQ"), and Li-Cycle Americas Corp., also an Ontario corporation, are the CCAA applicants (the "CCAA Applicants"). The CCAA Applicants, together with their affiliates in Europe and Asia that have not filed for CCAA protection, comprise all of the entities in the Li-Cycle corporate group ("Li-Cycle"). A corporate structure chart is attached to the Verified Petition as **Exhibit 1**.

[2]     An index of these documents is attached hereto as **Exhibit A**.

**PROFESSIONAL BACKGROUND**

4.      I have more than 36 years of advisory, turnaround and corporate restructuring experience and have been involved with restructurings in diverse industries, including tobacco, mining, softwood lumber, steel manufacturing, refrigerated warehousing, transportation, retail, telecommunications, manufacturing, education and media.

5.      I am an FCPA, FCA, alumnus of Ernst & Young LLP and financial expert in a public company context.  I have significant experience as a senior executive and experienced director of public and private companies in both Canada and the United States.

6.      I have been overseeing the Chapter 15 Debtors' restructuring effort since April 28, 2025.  As a result, I am familiar with the Chapter 15 Debtors' history, operations, assets, financial condition, business affairs and books and records; and I am competent to testify.  As the CRO of the Chapter 15 Debtors, I have knowledge of the matters to which I herein depose, except where I have obtained information from others.  In preparing this Declaration, I have consulted with other members of the Chapter 15 Debtors' senior management team, legal advisors, and representatives of Alvarez & Marsal Holdings, LLC, which is acting as the monitor of the Canadian Proceedings (the "Monitor").

**CANADIAN INSOLVENCY LAW AND THE CCAA**

7.      The *Companies' Creditors Arrangement Act* ("CCAA") is a Canadian law process that governs corporate reorganizations frequently (though not exclusively) used in a restructuring context.

8.      Upon a debtor's application under CCAA, the Canadian Court may issue an initial order in favor of such debtor, among other things, to appoint a monitor and a mediator to oversee the development of the CCAA Plan, and to order a stay of proceedings such that no proceeding or enforcement process in any Canadian court or tribunal may be commenced, continued or take place by or against such debtor except with the leave of the Canadian Court.

The stay of proceedings may be extended by the Canadian Court from time to time over the course of developing a CCAA plan.

9.       When the CCAA plan is finalized, the debtor will apply to the Canadian Court for a meeting order pursuant to which the CCAA Plan will be accepted for filing and establish date and time of a meeting of affected creditors to vote on the CCAA Plan.  The approval of a CCAA Plan is a two-step process.  First, the CCAA Plan needs to be approved by a majority of the creditors by number, together with two-thirds of the creditors in value.  *See* Companies' Creditors Arrangement Act  § 6(1).  Once the CCAA Plan is approved by the creditors, the debtor will seek the Canadian Court's approval in the form of a sanction order (the "Sanction Order").  The Canadian Proceedings are intended to benefit creditors according to their interests collectively, rather than to benefit any single creditor alone.

## BACKGROUND TO THE CHAPTER 15 DEBTORS AND THE CANADIAN PROCEEDINGS

### I.    The Chapter 15 Debtors' Business

10.      Li-Cycle is a global lithium-ion battery resource recovery company, established in 2016.  Li-Cycle is a public company that is headquartered in Toronto, Ontario.  Until recently, Li-Cycle was listed on the New York Stock Exchange ("NYSE") under the symbol "LICY".

11.      Li-Cycle's goal is to recycle all different types of lithium-ion batteries, recovering critical battery-grade materials and reinserting them back into the supply chain for a clean energy future using patent-protected Spoke & Hub Technologies™.  A description of the "Spokes" and the "Hub" are set forth below.

> a)  Li-Cycle's "Spokes" are pre-processing facilities where Li-Cycle recycles battery manufacturing scrap and end-of-life batteries to produce black mass, which is a powder-like substance which contains several valuable metals, including lithium, nickel and cobalt, (ii) a shredded metal foils product consisting largely of aluminum and copper and (iii) shredded plastics. Li-Cycle has five Spokes (the status of which are

4

described further herein) – located in Ontario, New York, Alabama, Arizona and Germany.

b)  Li-Cycle's planned "Hubs" are post-processing facilities where Li-Cycle would plan to process black mass to produce critical battery-grade materials, including lithium carbonate, which could then be used in the manufacture of batteries. Li-Cycle's first commercial Hub is partially constructed in Rochester, New York (the "Rochester Hub"). Li-Cycle's aim is for the Spokes and Hub to provide a complete solution to lithium-ion battery recycling. Li-Cycle's technology would enable a "circular loop" for electric vehicle ("EV") battery recycling.

12.    The Spokes and Hub are managed from Toronto, Canada.[3]  All management, corporate governance, financial reporting and administrative services for Li-Cycle, including each of the Chapter 15 Debtors, are performed out of Toronto.

13.    While Li-Cycle has considerable potential and is poised to become an industry leader to take advantage of the growth of the EV supply chain, Li-Cycle has encountered numerous challenges since the fall of 2023.  These challenges have severely strained Li-Cycle's liquidity, and have adversely impacted its ability to operate its Spokes and to continue the development of the Rochester Hub.  Among other things:

a)  The cost to construct the Rochester Hub increased rapidly and significantly, resulting in a pause in construction in October 2023; the commencement of a comprehensive review of the go-forward strategy for the project; the filing of various putative securities actions and an arbitration claim commenced by the general contractor for the Rochester Hub;

b)  Li-Cycle's Spokes have been unprofitable because of pricing for feedstock – particularly in North America – and relatively depressed commodity prices pertinent to its products (*e.g.*, nickel, cobalt); and

c)  Li-Cycle has been unable to raise the additional financing necessary to meet the conditions precedent for first, and

---

[3]  Until May 2025, Li-Cycle was managed from its global head office located at 207 Queens Quay West, Suite 590, Toronto, ON M5J 1A7.  Li-Cycle has now vacated these offices. Li-Cycle continues to be managed from the Toronto area, including from the officers of the Foreign Representative located at 32 Shorewood Place, Oakville, ON L6K 3Y4 and from the offices of McCarthy Tétrault LLP, Li-Cycle's Canadian counsel, located at 66 Wellington St. W., Suite 5300, Toronto, ON M5K 1E6.

subsequent, advances to be made under the DOE Loan Facility.

14.    The circumstances described in the preceding paragraph have adversely affected Li-Cycle's ability to raise additional debt or equity financing and has led to further complications, including:

    a)    The share price of Holdings' common shares has declined by over 99% since the pause on construction of the Rochester Hub was announced; and the common shares were de-listed from NYSE on March 9, 2025;

    b)    Due to a lack of available liquidity, Li-Cycle has paused operations at each of its Spokes (other than the Germany Spoke, which is not a part of the Canadian Proceedings or the Chapter 15 Cases (as defined below)) and reduced its active headcount from 536 as of September 30, 2023, to 119 as of today; and

    c)    Li-Cycle is in default under its secured and unsecured notes. While waivers had been negotiated with Glencore (defined below) and an unsecured noteholder, Wood River Capital, LLC, an affiliate of Koch Strategic Platforms, LLC (hereinafter, "Koch"), such waivers expired as of Tuesday, May 13, 2025 at 11:59 p.m.

15.    The CCAA Applicants are insolvent.  Earlier today, May 14, 2025, the CCAA Applicants (including the Chapter 15 Debtors) sought and obtained protection and further obtained from the Canadian Court an initial order (the "Initial Order"),[4] which, among other things (i) opened the Canadian Proceedings, (ii) imposed a stay for the Stay Period (as defined in the Initial Order) (iii) appointed Alvarez & Marsal Canada Inc. to serve as the Monitor in the Canadian Proceedings, (iv) approved my appointment as the CRO and the Foreign Representative for the CCAA Applicants and authorized me to file and prosecute the Verified Petition and these Chapter 15 cases (the "Chapter 15 Cases"). *See* Initial Order at ¶ 60.

16.    The CCAA Applicants intend to conduct a sale and realization process, with the assistance of Alvarez & Marsal Canada Securities ULC and the corporate services group of

---

[4]    A certified copy of the Initial Order is attached to the Verified Petition as **Exhibit 2**.

Alvarez & Marsal (in such capacities, "Alvarez & Marsal") to seek of, or investment in, their businesses.  The goal of such process is to identify a transaction or investment opportunity that will allow Li-Cycle to continue as a going concern, re-start operations at some or all of its paused Spokes and to resume construction of the Rochester Hub for the benefit of its employees, suppliers and the communities in which Li-Cycle operates.  Li-Cycle has appointment me as CRO to help guide it through this process.

17.    In view of the foregoing, the CCAA Applicants (including the Chapter 15 Debtors) determined that it was necessary and appropriate to seek relief from the Canadian Court (and this Court, in the case of the Chapter 15 Debtors) to allow Li-Cycle breathing space to seek to maximize value for all of its stakeholders.  If it can overcome its immediate challenges, Li-Cycle is poised to play a key role in a clean energy future by recycling and re-inserting critical materials back into the EV battery supply chain.

### A.  Corporate Structure

18.    The key members of Li-Cycle for purposes of these Chapter 15 Cases are as follows:

a)    Holdings, which is the ultimate parent company of all of the other CCAA Applicants and the direct parent of Global HQ. Global HQ operates the head and principal executive offices of Li-Cycle in Toronto, Ontario, from which management directs Li-Cycle's multi-national operations, including those of the Chapter 15 Debtors.  Global HQ also owns the intellectual property that is used in Li-Cycle's business (including the Chapter 15 Debtors' businesses) and licensed to the operating entities.  Global HQ is the direct parent of Li-Cycle Americas Corp., an Ontario corporation, which, in turn, is the direct parent of North America OpCo.

b)    North America OpCo, which is incorporated under the laws of the State of Delaware.  It is the entity that is generally responsible for sourcing inputs for, and selling the outputs from, the Spokes located in Canada and the United States as well as the future Rochester Hub.

c)    U.S. SpokeCo, which is incorporated under the laws of the State of Delaware.  Prior to the recent suspension of

        operations, U.S. SpokeCo operated the company's three Spokes located in the United States, including its Spokes in Rochester, New York, Gilbert, Arizona and Tuscaloosa, Alabama.

    d)     U.S. HubCo, which is incorporated under the laws of the State of Delaware.  It was in the process of developing the Rochester Hub prior to the pause in construction.

### B. The Chapter 15 Debtors' U.S. Assets

19.    The Chapter 15 Debtors' principal asset in the United States is its interest in an undrawn retainer in the approximate amount of $1 million with Freshfields US LLP ("Freshfields"), their United States counsel, in New York, NY.

20.    Holdings was, until very recently, listed on the NYSE (as defined below) and is a defendant in litigation pending in this district.  U.S. HubCo is a party to arbitration proceedings venued in New York City.  The Chapter 15 Debtors are parties to numerous agreements governed by New York law.

### II. The Chapter 15 Debtors' Properties

21.    The Chapter 15 Debtors do not own any real property, except for improvements affixed to a ground lease.  They are parties to various real property leases in the United States.

22.    New York Spoke.  Li-Cycle commenced operating a Spoke in Rochester, New York in late 2020.  The New York Spoke premises are leased by U.S. SpokeCo pursuant to a lease that currently runs to June 30, 2029.  The New York Spoke is a "Generation 2" facility, meaning it is based on a modular build with increased recovery rates.  Improvements at the New York Spoke were completed in 2022, which included upgrading the main line and adding ancillary processing capacity.  The New York Spoke has a total processing capacity of 8,000 tonnes per year, comprised of main line recycling capacity of 5,000 tonnes per year and ancillary processing capacity of up to 3,000 tonnes per year.

23.    Arizona Spoke.  In May 2022, Li-Cycle commenced operations at its Spoke in Gilbert, Arizona.  The Arizona Spoke premises are leased by U.S. SpokeCo pursuant to a lease

that currently runs to February 29, 2032. The Arizona Spoke is a "Generation 3" facility, meaning it is based on a modular build and has multi-stage shredding with capabilities to shred full-pack EV batteries, with increases to recovery rates. The Arizona Spoke has a total processing capacity of 23,000 tonnes per year, comprised of main line recycling capacity of 10,000 tonnes per year and ancillary processing capacity of up to 13,000 tonnes per year. U.S. SpokeCo also leases two warehouses in Mesa, Arizona. One lease runs to December 31, 2026; and the other is leased to May 21, 2034.

24.    Alabama Spoke. U.S. SpokeCo has a Spoke near Tuscaloosa, Alabama, which commenced operations in October 2022. U.S. SpokeCo leases the Alabama Spoke premises pursuant to a lease that currently runs to June 30, 2042. The Alabama Spoke is also a "Generation 3" facility and has a total main line processing capacity of 10,000 tonnes per year and ancillary processing capacity of up to 5,000 tonnes per year. U.S. SpokeCo also leases a storage facility near Tuscaloosa that supports the operations of the Alabama Spoke pursuant to a lease that currently runs to December 31, 2030, and an office near Birmingham, Alabama which is used as an engineering office primarily to support Li-Cycle's Rochester Hub project. The premises for the engineering office are leased pursuant to a lease agreement that currently runs to November 30, 2027.

25.    Rochester Hub. The Rochester Hub, which is Li-Cycle's first commercial Hub, is partially constructed in Rochester, New York. Li-Cycle's North American Spoke facilities were expected to be the primary suppliers of black mass and equivalents feedstock for the Rochester Hub. The location of the Rochester Hub was specifically selected due to the nature of the infrastructure available at the site, including utilities and road/rail networks.

26.    Li-Cycle expected that, when completed, the Rochester Hub would be the first commercial hydrometallurgical resource recovery facility in North America. Li-Cycle expected that the Rochester Hub would have the nameplate input capacity to process 35,000

9

tonnes of black mass and equivalents feedstock annually (equivalent to approximately 70,000-90,000 tonnes or 18 GWh of lithium-ion battery feed annually). The Rochester Hub was expected to employ a permanent workforce of approximately 270 employees once operational.

27.     Li-Cycle engaged (i) Hatch Associates Consultants, Inc. as its engineering and procurement contractor for the Rochester Hub, and (ii) MasTec Industrial, Corp. ("MasTec") as its general contractor for the Rochester Hub. As detailed below, Li-Cycle terminated its contract with MasTec due to sudden and significant cost overruns that were experienced in 2023.

28.     Construction on the Rochester Hub commenced in Q1 2022 and Li-Cycle initially expected that commissioning could be initiated in late 2023. However, as detailed further below, due to substantial cost overruns in the construction work, Li-Cycle paused construction in October 2023 and initiated a comprehensive project review to determine the go-forward strategy for the project.

29.     U.S. HubCo leases the land for the Rochester Hub pursuant to a ground lease that currently runs to March 31, 2042.

30.     On January 12, 2023, U.S. HubCo entered into a sublease agreement with Pike Conductor Dev 1, LLC ("Pike"), pursuant to which (among other things) the landlord agreed to construct a build-to-suit warehouse and administrative building (the "Warehouse Building"), at a total cost not to exceed the sum of $58,610,000 (the "Original Sublease"). U.S. HubCo paid $53,541,711.77 towards the cost of construction of the Warehouse Building and the balance of the construction costs owing by U.S. HubCo to Pike is $5,068,288.

31.     On May 31, 2024, U.S. HubCo entered into an amended and restated ground sublease agreement with Pike, providing for the sublease of the land on which the Warehouse Building (owned by U.S. HubCo) is situated and for the payment of the unpaid construction costs by early 2026 ("A&R Sublease"). The A&R Sublease currently runs to March 31, 2049.

The obligations of U.S. HubCo under the A&R Sublease are guaranteed by Holdings.

**III.      Summary of the Capital Structure of Li-Cycle**

32.      Until March 2024, Li-Cycle had no secured debt.  It funded its development through the issuance of common shares and unsecured convertible notes.  To support its growth and ongoing development of its "Spoke & Hub" network, Holdings succeeded in obtaining a conditional commitment from the United States Department of Energy (the "DOE") in February 2023 for a $375 million loan facility through the DOE's Advanced Technology Vehicles Manufacturing Program.  In November 2024, Li-Cycle entered into the definitive agreements for the DOE loan facility, with an increase in the facility size from $375 million to $475 million (the "DOE Loan Facility").  To date, no advances have been made under the DOE Loan Facility because the making of advances is conditioned on Li-Cycle obtaining third party financing of approximately $263 million, which has not occurred.

*A.  Glencore Debt*

33.      Aside from the DOE, which has not yet advanced funds under the DOE Loan Facility for the reasons described above, Glencore Ltd. (together with Glencore Canada Corporation, "Glencore") is Li-Cycle's only secured lender (except for certain mechanics' liens that have been filed against the Rochester Hub).  Glencore holds secured and unsecured notes in the aggregate amount of $327.5 million as of December 31, 2024.

33.      On May 31, 2022, Holdings issued to Glencore an unsecured convertible note in the aggregate principal amount of $200 million, having a maturity date of May 31, 2027 (the "Original Glencore Convertible Note").  Interest on the Original Glencore Convertible Note was payable in kind (PIK) based on SOFR plus 5.0% per annum.

34.      On March 25, 2024, Holdings issued to Glencore a senior secured convertible note (the "Glencore Secured Convertible Note") in an aggregate principal amount of $75 million  having a maturity date of March 25, 2029 (the "March 2024 Financing").

35.     Interest on the Glencore Secured Convertible Note has been payable in PIK based on SOFR plus 6.0% per annum.

36.     In connection with the March 2024 Financing, Li-Cycle and Glencore amended and restated the terms of the Original Glencore Convertible Note, in two tranches (collectively, the "Glencore A&R Notes"), each of which provided for new terms to come into effect upon the occurrence of certain future events, including adjustments to the maturity date, interest rate, and conversion price of such Glencore A&R Note to mirror the terms of the Glencore Secured Convertible Note, and the provision of guarantees and security on the applicable Glencore A&R Note consistent with the Glencore Secured Convertible Note.

37.     The modification of the first Glencore A&R Note in the original principal amount of approximately $116.6 million (the "First A&R Note") occurred in accordance with its terms on December 9, 2024, following Li-Cycle's entry into the DOE Loan Facility.

38.     The modification of the second Glencore A&R Note in the original principal amount of approximately $114.6 million (the "Second A&R Note") is scheduled to occur in accordance with its terms on the earliest to occur of (a) the first commercial production from the Rochester Hub, (b) construction costs exceeding the construction budget set forth in the DOE Loan Facility, and (c) June 1, 2026.

39.     The following is a summary of the convertible notes issued to Glencore as of December 31, 2024:

[*remainder of page intentionally left blank*]

| Note | Date Issued | Amount Issued | |
|------|-------------|---------------|---|
| **Secured** | | | |
| Secured Convertible Note | March 25, 2024 | 1. | $75.0 |
| First A&R Note | March 25, 2024 | 2. | $116.6 |
| PIK | December 31, 2024 | 3. | $14.0 |
| Total Secured | | 4. | $205.6 |
| **Unsecured** | | | |
| Second A&R Note | March 25, 2024 | 5. | $114.6 |
| PIK | December 31, 2024 | 6. | $7.2 |
| Total Unsecured | | 7. | $121.8 |
| **Total** | | 8. | **$327.4** |

40.     All obligations of Holdings with respect to the Glencore Secured Convertible Note and, following the occurrence of the Modification Date applicable to it, the Glencore A&R Notes, are guaranteed by all of the CCAA Applicants.  In addition, all of the CCAA Applicants (including the Chapter 15 Debtors) have granted first priority security interests in and liens on certain of their property to secure the Glencore Secured Convertible Note and the First A&R Note.

### B.  Koch Notes

41.     On September 29, 2021, Spring Creek Capital, LLC ("Spring Creek Capital") (an affiliate of Koch) advanced $100 million to Holdings pursuant to the purchase of an unsecured convertible note of Holdings in the principal amount of $100 million (the "Initial Koch Convertible Note").  Holdings has issued additional unsecured convertible notes in satisfaction of the interest due and payable on the Initial Koch Convertible Note (collectively, the "Koch PIK Notes").  The Initial Koch Convertible Note and Koch PIK Notes were assigned by Spring Creek Capital to an affiliate, Wood River Capital, LLC ("Wood River") on May 1, 2022.  The PIK Notes issued since that time have been issued to Wood River.  The aggregate principal amount outstanding on the Initial Koch Convertible Note and the PIK Notes as at December 31, 2024 was approximately $133.7 million.

### C. Common Shares

42.     Until February 27, 2025, the common shares of Holdings traded on the NYSE under the symbol "LICY".  Since then, the shares have traded on the OTCQX® Best Market, the highest level of OTC Markets on which 12,000 U.S. and international securities trade, under the ticker symbol "LICYF".  Holdings has been a reporting company in the United States since August 10, 2021.  It had approximately 44,541,690 common shares outstanding as at April 30, 2025.  Holdings has not, since its inception, declared or paid any dividends on its common shares.

### IV.   Li-Cycle's Challenges and Opportunities; Events Leading to the Canadian Proceedings

### A. Financial Challenges and Strained Liquidity

43.     The completion of the Rochester Hub is a key element to bring Li-Cycle to profitability. With construction of the Rochester Hub on hold and with costs to complete construction requiring significant investment, estimated at approximately $483.3 million, Li Cycle has actively sought and pursued a variety of strategic investments and alternatives.

44.     As described more fully below, for a year and a half, Li-Cycle actively sought to identify additional funding or other strategic alternatives, including after October 2023 under the guidance of a special committee of independent directors of Holdings (the "Special Committee") and with the assistance of the investment banking firm Moelis & Company ("Moelis").

45.     Despite the lengthy process conducted by Moelis and the additional investment support furnished by Glencore (as described at paragraphs 69-72 below), to date, Li-Cycle has been unable to execute a viable transaction or obtain sufficient additional investment.  Among other things, potential investors raised concerns during the process about the ongoing availability of the DOE Loan Facility in light of uncertainty regarding the financing of "green initiatives" in the current political climate in the United States.

### B. Li-Cycle Works to Obtain a DOE Loan Commitment

46.     Li-Cycle's Rochester Hub was expected to be the first source of recycled battery-grade lithium in North America.  To support the construction of the Rochester Hub, Holdings obtained a conditional commitment from the DOE.

47.     The conditional commitment was initially set to expire on August 27, 2023. Li-Cycle obtained extensions of the conditional commitment to February 27, 2025.

48.     On November 7, 2024, Li-Cycle announced that it entered into an agreement for an up-sized DOE Loan Facility of $475 million (including up to $445 million of principal and up to $30 million in capitalized interest), the first DOE Loan Facility to be finalized for a lithium-ion battery materials recycling company.  The DOE Loan Facility has a final maturity date of March 15, 2040 and advances will bear interest at a fixed rate of the applicable long-dated U.S. Treasury rate on the date of the advance, with a 0% spread.  There is a grace period on scheduled principal repayments until June 15, 2027.  Interest during the construction period can be capitalized (up to $30 million), instead of being paid in cash.

49.     The first advance under the DOE Loan Facility must occur on or prior to November 7, 2025 and is subject to the satisfaction or waiver of certain conditions and requirements, most notably Li-Cycle completing a base equity contribution to the Rochester Hub, which includes:

> a)  settling certain existing commitments relating to the project for costs incurred but not yet paid (which were approximately $89.7 million as of December 31, 2024); and
>
> b)  funding approximately $173 million in reserves for project construction, project ramp-up and Spoke capital expenditures, of which up to approximately $97 million can be satisfied through letters of credit.

50.     As detailed further below, Li-Cycle has continued to actively explore financing and strategic alternatives for a complete funding package needed to meet the base equity contribution so that advances under the DOE Loan Facility can be drawn and construction of

the Rochester Hub can be restarted.  However, Li-Cycle has not been able to obtain a funding package to date.

### C. Costs of Rochester Hub Increase Significantly

51.    On October 23, 2023, Holdings announced that it was pausing construction work on the Rochester Hub, due to escalating construction costs beyond its previously disclosed budget of $560 million.  The company announced that it would commence a comprehensive review and examine the capital cost, timing of completion, and go-forward construction strategy.

52.    On November 13, 2023, Holdings announced that its initial analysis of the Rochester Hub project indicated that the revised project costs could be in the range of $850 million to $1.0 billion.  The escalating costs were specifically related to the installation and labor costs for mechanical equipment, piping, structural steel, electrical and instrumentation for the measurement and process control devices.

53.    Li-Cycle had initially planned that the Rochester Hub would produce lithium carbonate, nickel sulphate and cobalt sulphate.  As part of its comprehensive review of the Rochester Hub project, Li-Cycle undertook an internal technical and economic review to determine the viability of focusing on constructing, commissioning and operating only those areas needed to produce lithium carbonate and mixed hydroxide precipitate ("MHP"), containing nickel, cobalt and manganese (the "MHP Scope").  Li-Cycle determined that proceeding with the MHP Scope instead of the broader scope that included production of nickel sulphate and cobalt sulphate would allow construction of the Rochester Hub to be completed sooner and at a lower cost.

54.    On March 18, 2024, Li-Cycle announced that it had confirmed the technical viability of the MHP Scope and estimated the cost to complete the Rochester Hub project under

the MHP Scope at approximately $508 million, bringing the total estimated project cost of the Rochester Hub to approximately $960 million.

55.     On October 31, 2024, Li-Cycle announced that it had completed the technical review of the MHP Scope and expected the Rochester Hub to produce up to approximately 8,250 tonnes of battery-grade lithium carbonate and up to approximately 72,000 tonnes of MHP annually.

56.     Construction of the Rochester Hub has yet to resume as Li-Cycle has not been able to obtain a complete funding package for the estimated cost to complete the Rochester Hub under the narrower MHP Scope.

### D.  *Commencement of Securities Litigation Against Li-Cycle*

57.     On October 23, 2023, Holdings announced that it was pausing construction of the Rochester Hub.  That same day, the share price of Holdings' common shares declined by over 45%.  Overall, since the announcement, the share price has declined more than 99%.

58.     The sharp drop in Holdings' share price resulted in the commencement of several putative class and derivative actions against Holdings and its directors and officers in Canada and the United States.  The actions in the United States are described below.  Holdings contests the allegations in the various class actions that have been commenced against it.

59.     On November 8, 2023, a putative federal securities class action lawsuit was commenced in the U.S. District Court for the Southern District of New York against Holdings, and certain of its officers and directors, on behalf of a proposed class of purchasers of Holdings' common shares during the period from January 27, 2022 through November 13, 2023 (*Hubiack v. Li-Cycle Holdings Corp., et al.*, 1:23-cv-09894 (S.D.N.Y.)).  The amended complaint asserts claims under Sections 10(b) and 20(a) of the U.S. Securities Exchange Act of 1934, and alleges that the defendants issued false and misleading statements regarding the Rochester Hub's construction budget, costs and timeline, which were allegedly revealed beginning on October

23, 2023, when Li-Cycle announced that it would pause construction on the Rochester Hub project. On June 10, 2024, the District Court granted defendants' motion to dismiss in full with prejudice. *Hubiack v. Li-Cycle Holdings Corp.*, *et al.*, No. 23-cv-09894 (S.D.N.Y.) (Dkt. No. 58). The lead plaintiff has appealed to the Second Circuit, *see id.* at Dkt. No. 60, and defendants' appellate brief must be filed on June 2, 2025.[5]

60.     On December 4, 2023, a putative shareholder derivative action was filed in the Supreme Court of the State of New York, Monroe County, purportedly on behalf of Holdings (as nominal defendant) against certain of Holdings' current and/or former officers and directors (*Nieves v. Johnston, et. al.*, Index No. E2023014542 (N.Y. Sup. Ct.)). The action concerns the same alleged misstatements or omissions at issue in the New York Securities Action, and asserts common law claims for breach of fiduciary duty, waste, unjust enrichment, and gross mismanagement. The action seeks to recover unspecified compensatory damages on behalf of Holdings, an award of costs and expenses and other relief. On February 29, 2024, the parties agreed to stay the action pending resolution of the New York securities action.

### E. Construction Claims Against U.S. HubCo

61.     As a result of the sudden and significant cost overruns at the Rochester Hub and the suspension of construction activity at the Rochester Hub, U.S. HubCo has been subjected to various litigations. Indeed, because of these cost overruns, Li-Cycle terminated its contract with its general contractor for the Rochester Hub project, MasTec. On April 9, 2024, MasTec commenced: (i) arbitration proceedings against U.S. HubCo under the terms of the parties' Construction Agreement and (ii) a lien foreclosure action, in the Supreme Court, County of Monroe, New York.

---

[5]     On November 27, 2023, a putative Ontario securities class action claim was commenced in the Ontario Superior Court of Justice against Holdings and its CEO on behalf of a proposed class of purchasers of Holdings' common shares who acquired their shares during the period from February 27, 2023 through November 10, 2023 (*Wyshynski v. Li-Cycle Holdings Corp. et al.*, Court File No. CV-23-00710373-00CP).

62.     MasTec's arbitration claim is for at least $48,674,848 plus interest, fees, costs and expenses thereon.

63.     Separately, on July 22, 2024, MasTec North America Inc. ("MasTec NA"), an affiliate of MasTec, filed a lien foreclosure action as assignee of several MasTec subcontractors.  On January 7, 2025, Li-Cycle filed a motion to: (a) stay the MasTec foreclosure action, pending determination of the arbitration, and (b) consolidate the MasTec NA foreclosure action into the MasTec action.  The motion to stay and consolidate was granted on March 17, 2025.  It is currently under appeal.  Several lienors, including the MasTec entities with assignments, have filed a notice of appeal.

64.     On April 29, 2024, U.S. HubCo delivered its arbitration answering statement, which includes counter-claims against MasTec for costs and expenses (including improperly inflated values for work and staffing) in the amount of $27,310,034, plus interest, fees and expenses.  The arbitration hearings are scheduled to commence on July 21, 2026 in New York City.  U.S. HubCo served MasTec with document demands and interrogatories on February 21, 2025 and submitted its response to MasTec's document demands and interrogatories on March 28, 2025.

65.     U.S. HubCo has also received various notices and demands from subcontractors and other counterparties involved in the construction of the Rochester Hub threatening legal action due to unpaid invoices.

66.     U.S. HubCo is subject to mechanics' liens filed against the Rochester Hub in the aggregate amount of approximately $60.6 million and against the Rochester Warehouse in the aggregate amount of approximately $5.1 million.

### F. Appointment of Special Committee, Engagement of Moelis and Retention of Alvarez & Marsal

67.     In connection with the comprehensive review of the Rochester Hub, the board of directors of Holdings established the Special Committee.  The Special Committee's mandate

is to (i) oversee and supervise a strategic review of all or any of the Li-Cycle's operations and capital projects, including its sales, general and administration functions, and (ii) consider financing and other strategic alternatives.

68.    Beginning in the Fall of 2023, the Special Committee retained:

a)    Moelis, a leading global independent investment bank, as a financial advisor to assist in evaluating financing and strategic alternatives for Li-Cycle; and

b)    AlixPartners LLC, an internationally recognized restructuring and turnaround advisory and consulting firm, to advise the Special Committee as it sought to manage its liquidity and evaluate the strategic alternatives available.

### G. Moelis Conducts Robust Process

69.    Beginning in late November 2023, Moelis conducted a broad market canvass that included contacting 144 potential strategic and financial investors, 57 of whom executed non-disclosure agreements and were granted access to a data room that had been established and was continuously updated by Moelis with the assistance of Li-Cycle and its advisors.

70.    Li-Cycle and Moelis conducted over 50 management presentations, participated in numerous follow-up calls and site visits and answered various questions and requests for further information from the participants in the process.

71.    Moelis established an initial target date of January 15, 2024 for the receipt of proposals from the participants in the process.  Numerous proposals were received both before and after the target date.  Li-Cycle and Moelis engaged with the participants that had submitted proposals to clarify and advance their proposals and provided further information requested by the participants over the period of several months.

72.    By late February 2024, Li-Cycle and Moelis transitioned to focusing on two independent term sheets each for $75 million, each in the form of senior secured convertible notes.  One of the senior secured convertible note term sheets was from Glencore and the other

was from a separate strategic party. Li-Cycle and Moelis continued to negotiate with both Glencore and the other separate strategic party through to early March 2024.

73.     In March 2024, in order for Li-Cycle to have adequate liquidity to continue to operate its then-operational Spokes, pursue the DOE Loan Facility and complete the Special Committee's review of strategic alternatives, Li-Cycle obtained an additional $75 million in funding from Glencore.

74.     As a condition of obtaining that additional financing, Li-Cycle agreed that the previously unsecured debt of Glencore under the Original Glencore Convertible Note would potentially become secured in two tranches on modification dates that reflected key milestones in Li-Cycle's push to complete development of the Rochester Hub:

    a)   First modification date: the earlier of (a) the date that is one month after the effectiveness and initial funding, if any, of a project loan financing for the Rochester Hub, and (b) December 31, 2024; and

    b)   Second modification date: the earliest to occur of (a) the first commercial production from the Rochester Hub, (b) construction costs exceeding the construction budget set forth in the project loan financing, and (c) June 1, 2026.

75.     As set out above, the first modification date in relation to the First A&R Note occurred following Li-Cycle entering into of the DOE Loan Facility. The second modification date has yet to occur.

76.     As part of the DOE Loan Facility closing efforts, Li-Cycle worked with the DOE to successfully upsize the DOE Loan Facility from $375 million to $475 million. The DOE Loan Facility was signed successfully on November 7, 2024. Alongside the upsizing of the DOE Loan Facility, through the final negotiations with the DOE, the conditions precedent to the DOE First Advance were finalized. Among other items, the conditions precedent to the DOE First Advance include (i) settling existing commitments relating to the Rochester Hub project for costs incurred but not yet paid, which was approximately $89.7 million as of

December 31, 2024; and (ii) funding approximately $173 million in reserve account requirements of which approximately $97 million can be satisfied through letters of credit. In total, through the second phase efforts with Moelis, the target was to raise an incremental approximately $263 million of financing (comprising of the requirement to settle prior Rochester Hub costs that were incurred but not paid; and the DOE reserve account requirements).

77.     In tandem with the closing efforts associated with the DOE Loan Facility, Moelis initially commenced second phase outreach to prospective investors and strategic counterparties, between April and November 2024. Outreach efforts were increased further in November 2024, following the signing of the DOE Loan Facility, based on the finalized funding requirements as part of the conditions precedent to the DOE First Advance.

78.     As part of Moelis' second phase outreach efforts, between November 2024 and February 2025, Moelis conducted a broad market canvass for a second time, which included contacting 149 potential strategic and financial investors, 52 of whom had prior executed and active non-disclosure agreements, or executed non-disclosure agreements anew, and were granted access to a data room that had been established and was continuously updated by Moelis with the assistance of Li-Cycle and its advisors.

79.     As part of the discussions between Moelis and the counterparties, as well as through the course of approximately 22 management presentations between November 2024 and February 2025, there was a range of feedback provided. Specifically, counterparties provided feedback regarding (i) being concerned with respect to uncertainty related to the current U.S. federal administration and potential impacts on DOE-related funding; (ii) Li-Cycle's capital structure and the level of existing debt; (iii) hesitation regarding the EV and

battery materials market outlook; (iv) the relatively large level of financing required to enable the first advance under the DOE Loan Facility (a total of approximately $263 million).

80.    As a result of this feedback, none of the strategic and financial counterparties contacted by Moelis progressed to the stage of a term sheet.  Efforts with Moelis were paused in late February 2025, alongside considerations associated with Li-Cycle's de-listing from NYSE (as detailed further herein).  In sum, despite the efforts described above, Li-Cycle has been unable to find a strategic investor, and it has virtually exhausted its liquidity.

## THE CANADIAN PROCEEDINGS

### I.    Chapter 15 Recognition

81.    The Chapter 15 Debtors conduct business in and have numerous assets located within the territorial jurisdiction of the United States, in addition to being parties to certain litigation matters pending in courts throughout the United States.  Accordingly, on May 13, 2025, the Special Committee (i) appointed me to act as the foreign representative for each of the Chapter 15 Debtors in their respective forthcoming Chapter 15 Cases; and (ii) authorized me to seek Chapter 15 recognition of the Canadian Proceedings in the United States.

82.    By filing a Chapter 15 petition in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), I now seek the entry of an order by the Bankruptcy Court: (i) recognizing the Canadian Proceedings as foreign main proceedings; and (ii) granting a temporary restraining order.

83.    I have been advised by counsel of the definition of a "foreign proceeding" under Section 101(23) of the Bankruptcy Code.  To the best of my knowledge, I am not aware of any other "foreign proceeding" within the meaning of Section 101(23) of the Bankruptcy Code with respect to the Chapter 15 Debtors.

### A. *Center of Main Interests of the Debtors*

84.     The Canadian Proceedings should be recognized as a "foreign main proceeding" as defined in Section 1502(4) of the Bankruptcy Code.  I have been informed that a foreign proceeding must be recognized as a "foreign main proceeding" if it is pending in the country where the debtor has its center of main interests ("COMI"). 11 U.S.C. § 1517(b).

85.     The Chapter 15 Debtors have substantially more ties to Canada than to any other country.  The Chapter 15 Debtors are each part of the highly-integrated business of Li-Cycle that has its center of main interests in Toronto, Ontario.  Further, notwithstanding that North America OpCo, U.S. SpokeCo, and U.S. Hubco are each registered in Delaware, their COMI, along with that of Holdings, is in Toronto, Ontario, for the following reasons:

    a)    The registered head office of Holdings is in Toronto, Ontario, Canada and the other Chapter 15 Debtors are run out of Toronto, Ontario;

    b)    a majority of the key management personnel of each of the Chapter 15 Debtors are located in Toronto, Ontario, and are employed by Global HQ which is incorporated and domiciled in Toronto, Ontario ("Key Management Personnel");

    c)    all material financial, strategic, management, marketing and personnel decisions of the Chapter 15 Debtors are made in Toronto, Ontario by the Chapter 15 Debtors' senior management also located in Toronto, Ontario;

    d)    each of the Chapter 15 Debtors critical strategic decisions are mainly made in Toronto, Ontario by the Chapter 15 Debtors' senior management, a majority of whom are located in Toronto, Ontario;

    e)    all material and/or long term contracts and expenses are subject to approval by the Key Management Personnel;

    f)    most material and/or long-term contracts to which any Chapter 15 Debtor entity is a party are negotiated by Key Management Personnel;

    g)    corporate governance and regulatory compliance for each of the Chapter 15 Debtors is overseen by the Key Management Personnel;

h)    key accounting decisions and all plans, budgets and financial projections are subject to the approval of the Key Management Personnel;

i)    meetings for directors and officers, other management and senior staff of the Chapter 15 Debtors are regularly held in Toronto, Ontario;

j)    marketing and business development initiatives are overseen from Li-Cycle's marketing team located in Toronto, Ontario;

k)    key human resources decisions, including decisions pertaining to, *inter alia*, payroll budgets and augmentation or reduction of employee headcount as per the approved budget, and retaining of me as CRO are and have been made in Toronto, Ontario;

l)    the Chapter 15 Debtors formed in the United States have employees dispersed throughout several regions in the United States, including Arizona, Alabama and New York, but the management decisions come from Toronto, Ontario;

m)    planning, budgeting, management of tax, treasury and cash management, and preparation of financial projections for the Chapter 15 Debtors is done from Toronto, Ontario;

n)    certain of the Chapter 15 Debtors' key suppliers with whom the Chapter 15 Debtors have contracts are in Toronto, Ontario;

o)    the majority of the senior officers and management employees of the Chapter 15 Debtors reside in Canada;

p)    Holdings, as the publicly listed entity, receives all proceeds from share capital issuances and loan proceeds, and uses such proceeds to fund the other Chapter 15 Debtor entities;

q)    the operations of all of the Chapter 15 Debtor entities are generally funded from equity contributions or intercompany advances from Holdings;

r)    the CRO is located in Oakville, Canada;

s)    all intellectual property used in the Chapter 15 Debtor's business, which is a key asset in this highly-specialized, cutting-edge business, is owned by Global HQ;

t)    all research and development for the business is undertaken by Global HQ;

u)    the books and records of the Chapter 15 Debtors are kept in Ontario at Global HQ;

v)   Ontario is the readily ascertainable jurisdiction by the Chapter 15 Debtors' creditors, considering, among other things, that the Holdings is the sole borrowing entity pursuant to the Glencore Notes and the DOE Loan Facility, and a substantial amount of claims, both secured and unsecured, are owed to Canadian creditors (including loans for which the Chapter 15 Debtors are guarantors);

w)   the Chapter 15 Debtors operate on a consolidated basis with a unified cash management system;

x)   the Chapter 15 Debtors operate as one corporate group controlled by Holdings, which controls the operations and strategic direction of the Chapter 15 Debtors as the ultimate parent company of its subsidiaries; and

y)   financing and other support services for the Chapter 15 Debtors' activities, including with respect to any activities in the United States, are largely provided by Holdings.

86.   Accordingly, I submit that, pursuant to Section 1516(c) of the Bankruptcy Code, the Debtors are entitled to the presumption that its COMI is Canada.

## RELIEF SOUGHT

87.   With this Declaration, I have filed the Verified Petition seeking entry of an order providing the following relief:

a)   recognition pursuant to Section 1517 of the Bankruptcy Code of the Canadian Proceedings as a "foreign main proceeding" as defined in Section 1502(4) of the Bankruptcy Code;

b)   recognition that the Foreign Representative is the "foreign representative" on a final basis (as defined in Section 101(24) of the Bankruptcy Code);

c)   all relief automatically available pursuant to Section 1520 of the Bankruptcy Code, including a stay of execution against the Debtors' assets in the United States and barring, enjoining, and staying, pursuant to Section 362 of the Bankruptcy Code, any action to interfere with these assets;

d)   comity and full force and effect in the United States for the Canadian Proceedings and all orders of the Canadian Court;

e)   enjoining all parties and entities from taking or continuing any act to obtain possession of, or exercise control over any

property of the Debtors pursuant to Section 1519 of the Bankruptcy Code; and

f)  such other and further relief as is appropriate under the circumstances pursuant to Sections 105(a) and 1507 of the Bankruptcy Code.

88.    To the extent the relief requested herein exceeds the relief available to the Debtors pursuant to Section 1520 of the Bankruptcy Code, I request this relief pursuant to Sections 1507 and 1521(a)(1) and (2) of the Bankruptcy Code.

89.    In the event the Bankruptcy Court were to determine the Canadian Proceedings are not foreign main proceedings, I request that the Bankruptcy Court nevertheless grant the relief requested above pursuant to Sections 1507 and 1521 of the Bankruptcy Code.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the United States of America that the information set forth above is true and correct to the best of my knowledge, information and belief.

Date: May 14, 2025
Oakville, Ontario

_____
William E. Aziz
Foreign Representative